[No. 28528. Department One. October 3, 1941.]

*In the Matter of the Welfare of* ANNA WILLIAMS.
ANNE WILLIAMS (*whose correct Christian name is Anna*), *Plaintiff,* v. THE SUPERIOR COURT FOR KITSAP COUNTY, *Respondent.*[1]

*Marion Garland, Jr.,* for plaintiff.

*Merrill R. Wallace,* for respondent.

STEINERT, J.—The present proceeding was initiated in this court by the adoptive mother of a minor child to review, by writ of certiorari, an order wherein the superior court for Kitsap county, exercising its jurisdiction in juvenile cases, found the minor to be a de-

pendent child within the meaning of the juvenile court law and expressed the intention of taking her from her adoptive mother and giving her into the custody of her natural mother, but directed that the child be placed temporarily in the custody of the juvenile officer of the court, pending the final determination, in this proceeding, of the questions involved in the case.

Anna Williams, the minor child with whom we are here concerned, was, at the time of the hearing in the superior court, slightly over seven years of age. She is the daughter of James Kaplen and his former wife Dorothy Kaplen, now Dorothy Stuart, of San Francisco, California. James Kaplen, the father of the child, is the adopted son of Anna Williams, the plaintiff herein. The legal relationship of plaintiff to little Anna is, therefore, that of grandmother. Plaintiff, who has been married twice, adopted James when he was a year and a half old. After his adoption and some time after the death of her first husband, plaintiff married George Williams about twenty years ago. Plaintiff is now sixty-four years of age.

Dorothy Kaplen (now Stuart), natural mother of Anna Williams, the minor whose welfare is here in question, was divorced from James Kaplen some time prior to September, 1937. At the time of her divorce, she was the mother of three children, including little Anna. On account of her straitened circumstances, the mother permitted plaintiff and her husband, George Williams, to adopt Anna, whose name was thereupon changed from Anna Arlene Kaplen to Anna Arlene Williams. Since that time, little Anna has lived with plaintiff, her grandmother and adoptive mother. The two other minor children of Dorothy Kaplen (Stuart) referred to above have, for similar reasons, been adopted by other persons and apparently both now have good homes.

James Kaplen, the natural father of Anna, appears never to have done anything for the child. In fact, at the time of her adoption by plaintiff, he had been convicted of a crime and had been sentenced to the penitentiary, from which he was paroled about fifteen months ago. So far as the record shows, his conduct since then has been anything but exemplary, despite the fact that, for a part of the time, he lived at the home of plaintiff, where his daughter was then residing.

About three years ago, after Anna's adoption, plaintiff and her husband, George Williams, became estranged and have ever since lived separate and apart, she residing in Bremerton, Washington, and he in San Francisco, California.

In November, 1937, which was about two months after Anna's adoption, Dorothy Kaplen, her natural mother, married Frank Lee Stuart, now of San Francisco. One child has since been born to them. From the record, Mr. Stuart appears to be a steady man and good husband. He has, furthermore, expressed his willingness and desire to take Anna into his home and provide for her in the event her custody is awarded to his wife.

About two years ago, at the instance of the welfare department of Kitsap county, a proceeding was instituted in the superior court for that county to have little Anna taken from the custody of plaintiff, the adoptive mother, on grounds less serious than those involved in the proceeding which we are now asked to review. A lengthy hearing was had at that time, and, according to a statement contained in the oral decision in the pending case, the defendant trial judge, who also presided at the earlier hearing, was apparently convinced that the child had been encouraged to do things which, if she were allowed to persist in

them, would lead to habits of dishonesty. However, the judge also seems to have been of the opinion at that time that Dorothy Stuart's future circumstances, following two years of a second marriage, were not yet assured, and, no satisfactory alternative with reference to Anna's custody being then presented, the judge declined to make any change of custody. Plaintiff was therefore allowed at that time to keep the child.

On July 8, 1941, Dorothy Stuart, the natural mother, filed in the superior court for Kitsap county the petition to which the present proceeding relates. In that petition it was alleged, among other things, that plaintiff herein, the adoptive mother of Anna, was incapable of exercising, and unwilling to maintain, proper parental control over the child, and that the conditions surrounding the home were not fit or conducive to Anna's welfare, but were of such nature as to cause apprehension that the child would grow up to lead an idle, immoral life.

The prayer of the petition was that the minor be adjudged a delinquent and dependent child; that she be made a ward of the court; and that such other relief be granted as seemed just and equitable under the circumstances.

A summons was directed to plaintiff herein, and shortly thereafter a full hearing consuming the greater part of a day was had. Fourteen witnesses were examined. We shall not set forth the evidence in minute detail. It is sufficient, at this point, to say that the testimony in support of the petition was specific and emphatic to the effect that the circumstances and conditions surrounding the life of the child were of a kind and character to which no child, particularly a little girl, should be exposed, if there were any possible way of avoiding it. On the other hand, an equal amount of testimony, in point of number of witnesses, was like-

wise definite and emphatic to the effect that plaintiff, the adoptive mother, had taken proper care of the child, and that the conditions of her surroundings were not such as would in any way affect her harmfully. We are also constrained to say that we are satisfied from the record that plaintiff is intensely devoted to Anna, has properly supplied her with food and clothing, is personally concerned about her welfare, and would probably do the best she could, under existing circumstances, to rear her properly. The oral decision of the trial judge indicates that he was, to a great extent at least, of the same view.

However, we are also convinced from the record that the trial court was fully justified in finding that the conditions and surroundings of plaintiff's home were not suitable nor conducive to the welfare of the child, and that by reason of such surroundings and conditions and the advanced age of plaintiff she was not a fit person to have the custody of a child of such tender years. The situation as it now exists comes about largely from conditions over which plaintiff apparently does not have full control. The premises upon which she lives, and which she owns, consist of a dwelling house, which has been converted into two small apartments having four rooms and a bath upstairs and two rooms with bath downstairs, together with a small house located in the back yard.

Plaintiff gains her livelihood from renting the downstairs apartment and the house in the rear, and from roomers and boarders, both men and women, in her own apartment upstairs. Owing to the inadequate housing facilities which have obtained in Bremerton for some time, properties such as those owned and conducted by plaintiff are overcrowded. Many of her guests have been transient and, unfortunately, many of them also appear to have been undesirable. Per-

sons living or visiting on the premises have engaged in frequent drinking of intoxicating liquor, boisterous conduct at all hours of the night, and other objectionable practices. The police have been called a number of times to quell the disturbances.

Whatever may be plaintiff's personal attitude toward the matters above mentioned, the fact remains that she has not been able, and is not in a position, to remedy them.

The juvenile court law, Rem. Rev. Stat., §§ 1987-1 to 1987-18 [P. C. §§ 593 to 610], inclusive, relates to the welfare of dependent and delinquent children, makes provision for their custody, care, guardianship, and control, and prescribes a procedure for the proper administration of the act. We will make brief reference to those provisions which are particularly applicable to this case.

Rem. Rev. Stat., § 1987-1, sets forth eighteen classifications under which any child less than eighteen years of age may be adjudged a dependent child. The seventh classification relates to a child within the prescribed age limit whose home is for any reason an unfit place for such child. The thirteenth classification relates to a child within the same age limit who for lack of proper provision by its parent, guardian, or custodian is in danger of being brought up to lead an idle, dissolute, or immoral life. Rem. Rev. Stat. (Sup.), § 1987-2, confers jurisdiction in such matters upon the superior courts in the several counties of the state.

Rem. Rev. Stat., § 1987-8, provides that, when any such child shall have been found to be delinquent or dependent, within the meaning of the act, the court may at any time make an order committing the child to some suitable institution or to the care of some reputable citizen of good moral character. Rem. Rev. Stat., § 1987-9, declares that the jurisdiction of the

court shall continue over every child brought before the court, or committed pursuant to the act, with power in the court to order a change in the care or custody of such child, if at any time it is made to appear to the court that it would be to the best interests of the child to make such change. Rem. Rev. Stat., § 1987-10, provides that, upon request of the child, or of either of its parents, or guardian, or custodian, the hearing may be had privately, and that, after acquiring jurisdiction over any child, the court shall have power to make an order with respect to the custody, care, or control of such child, or any order which in the judgment of the court would promote the child's health and welfare. Finally, Rem. Rev. Stat., § 1987-14, declares, in part:

"This act shall be liberally construed to the end that its purpose may be carried out, to wit: that the care, custody and discipline of a dependent or delinquent child as defined in this act shall approximate as nearly as may be that which should be given by its parents, and in all cases where it can be properly done, the dependent or delinquent child as defined in this act shall be placed in an approved family and may become a member of the family, by adoption or otherwise. . . ."

In cases arising under the juvenile court law, where the court is called upon to determine the custody of a child, we have uniformly held that the welfare of the child is the paramount consideration. *In re Day,* 189 Wash. 368, 382, 65 P. (2d) 1049, 1055, and cases therein cited. Upon that principle, we are of the opinion that, under the evidence adduced, the trial court was fully justified in finding that the conditions and surroundings to which the child Anna was subjected were not suitable or conducive to her welfare, and that her custody should be taken from plaintiff.

Two specific assignments of error are made in plaintiff's brief. One is that, even if the trial court

was correct in finding Anna Williams to be a dependent child, it nevertheless erred in taking the child from plaintiff, her adoptive parent, without allowing a probation period to give the child a chance to reform. This contention is based on Rem. Rev. Stat., § 1987-14, which reads, in part, as follows:

" . . . No dependent or delinquent child as defined in this act shall be taken from the custody of its parent, parents or legal guardian, without the consent of such parent, parents or guardian, unless the court shall find such parent, parents or guardian is incapable or has failed or neglected to provide proper maintenance, training and education for said child; *or unless said child has been tried on probation in said custody, and has failed to reform,* or unless the court shall find that the welfare of said child requires that his custody shall be taken from said parent or guardian. . . ." (Italics ours.)

Particular reliance is placed by plaintiff upon that part of the section which we have italicized.

Two answers may be made to plaintiff's contention: First, it is our opinion that the provision relating to probation and reformation has reference only to acts committed, or conduct persisted in, by the child itself, not to circumstances, conditions, and surroundings over which the child has no control, or for the existence of which it has not been responsible. In this case, the question is not one of probation or reformation of the child, but rather of conditions and surroundings to which the child is subjected. Second, the statute above quoted is expressed in the disjunctive, and makes any one of the three grounds therein specified a sufficient basis for a change of custody. One of the grounds stated therein is a finding by the court that the welfare of the child requires that its custody shall be taken from the parent or guardian. In the instant case, the court did make such a finding.

The other assignment of error is that the court

considered evidence outside the record. Under this assignment, plaintiff first complains that, during the course of the trial, the judge interviewed the child privately and in the absence of plaintiff. The record discloses, however, not only that plaintiff's counsel stipulated that this might be done, but also that, at the conclusion of the testimony taken in open court, he reminded the court of the examination yet to be made. Upon that stipulation, the judge interviewed the child privately. Plaintiff therefore cannot complain of the court's action in that respect.

■ Plaintiff next complains that the court took into consideration a statement which James Kaplen had made to the judge, prior to the trial, to the effect that plaintiff, his adoptive mother, was not a fit person to have custody of Anna. That matter was brought to light by the trial judge himself upon his interrogation of plaintiff. She in turn testified that the reason why the son had so reported to the court was that he had learned that she, his mother, had willed her property to Anna, rather than to him. If the statement made by James Kaplen originally had any weight whatever with the court, plaintiff had full opportunity to mitigate its effect by explaining, as she did, the reason for her son's attitude, or else by otherwise refuting the truth of the statement. We find no error with respect to this feature of the case.

■ Plaintiff next complains because the court, in its oral decision, referred to and considered the fact that she and her husband, George Williams, had not been living together the last three years. Again, that matter was brought out upon interrogation of plaintiff by the court, and plaintiff was given full opportunity to explain the reason for the separation. The facts that the adoptive father was no longer at home and that the influence which he might otherwise have exerted was

lacking, were proper to be considered by the court upon the issues involved.

Plaintiff next complains because the court took into consideration the present circumstances of Dorothy Stuart, the natural mother, and the propriety of turning the child over to her. Evidence upon those questions was admitted without objection on the part of plaintiff, and she, in turn, failed to offer any evidence to the contrary. She is therefore not in a position to complain that the court considered evidence which was a part of the record.

Plaintiff finally complains because the court referred to, and took into consideration, a report which the welfare department had rendered to the court concerning Dorothy Stuart and her present husband. The report, which was favorable to Mr. and Mrs. Stuart, was not made a part of the record in this case and was merely mentioned, for the first time, in the court's oral decision. Plaintiff now contends that the court based its decision, in part, upon evidence which was not in the record and which she had no opportunity to combat.

Manifestly, the report had nothing to do with the court's finding that the minor child's recent surroundings were not conducive to her welfare and that plaintiff was not a fit person to have custody of her. The report related solely to the fitness of the natural mother and her present husband to have custody of the child. The matter of placing the child in the custody of Dorothy Stuart, however, is not before us in this proceeding, for the reason that the order under review made no final disposition of the child, but merely placed her temporarily in the custody of the juvenile officer. Whether or not plaintiff is entitled to be heard upon the question of Dorothy Stuart's fitness we need not now decide. That is a matter to be considered

when the superior court, acting within its juvenile jurisdiction, reaches the question of making a permanent disposition of the child's custody. Presumably, the court will afford plaintiff every right and privilege to which she is legally entitled.

The order, as entered by the superior court, is affirmed.

ROBINSON, C. J., MAIN, MILLARD, and DRIVER, JJ., concur.

[1]Reported in 117 P. (2d) 210.